UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case Number: 10-60996-CIV-MORENO

HENRI HAGE,

    Appellant,

vs.

SONYA L. SALKIN, as Trustee in Bankruptcy
for Maxko Petroleum, LLC,

    Defendant.
_____/



CLOSED CIVIL CASE

## ORDER AFFIRMING FINAL JUDGMENT OF BANKRUPTCY COURT

This appeal arises from the Bankruptcy Court's entry of final judgment in favor of Appellee Sonya L. Salkin, the Trustee in bankruptcy for Maxko Petroleum, LLC ("Maxko" or the "Debtor"), and against Appellant Henri Hage for breach of contract. The Debtor had filed for bankruptcy on April 16, 2008. *In re Maxko Petroleum, LLC*, Case No. 08-14652-BKC-JKO (the "bankruptcy case"). Salkin then sued Hage in an adversary proceeding to recover damages for his failure to perform and close on his backup bid for the Debtor's gas station property which was auctioned at a court-ordered auction sale on September 16, 2008. *See Salkin v. Hage*, Adversary No. 08-01862-JKO (the "Hage adversary case"). Salkin had also sued Palm Beach International ("PBI"), the high bidder, and Aabhash Pradhan–the president, owner, and guarantor of PBI's performance obligations–in a separate adversary proceeding. *See Salkin v. Palm Beach Int'l*, Adversary No. 08-01833-JKO (the "PBI adversary case"). The Bankruptcy Court consolidated the two cases, and on October 7 and 8, 2009 a consolidated trial was held. The Bankruptcy Court entered its Findings of Fact and Conclusions of Law on March 12, 2010, finding that Salkin was entitled to final judgment

against Hage. *See* Findings of Fact and Conclusions of Law, ECF No. 71. On April 6, 2010 the Bankruptcy Court entered final judgment awarding damages in favor of Salkin and against Hage in the aggregate amount of $1,307,914.31. *See* Second Am. Final J., ECF No. 93 (the "Final Judgment"). Hage seeks the reversal of the Final Judgment in its entirety as well as the Findings of Fact and Conclusions of Law. For the reasons stated below, however, this Court finds no error in the Bankruptcy Court's Findings of Fact and Conclusions of Law and affirms that court's entry of final judgment in favor of Appellee and against Appellant.

## I. Background

Maxko, the Debtor, was a Florida limited liability company owned by Theodora Maxakoulis and directed by her son, William ("Bill") Maxakoulis. Prior to filing bankruptcy, the Debtor was the owner of real property, improvements, and fixtures thereon in Sunrise, Florida. On this property was operated a Chevron gas station, convenience store, and pizza restaurant. The gas station was operated by Sunrise Chevron, Inc, which was owned by members of the Maxakoulis family, including Bill Maxakoulis. Testimony established that this division of operation and ownership is standard practice in the industry. Moreover, several pleadings in the bankruptcy case demonstrate that the existence and role of Sunrise Chevron was clearly noted for the Bankruptcy Court as well as any interested parties. *See* Final Order Granting Mot. to Use Cash Collateral ¶ 16, June 9, 2008, ECF No. 29 ("Final Cash Collateral Order"); Mot. for Order Establishing Bidding Procedures ¶¶ 5, 6, 12, July 31, 2008, ECF No. 39. In any event, it was agreed and ordered at the inception of the bankruptcy case that the income and operations of both the Debtor and Sunrise Chevron would be treated as one. *See* Final Cash Collateral Order at 4.

After a court hearing, the Bankruptcy Court entered an order on August 15, 2008 establishing

the bidding procedures for the auction sale of the Debtor's property, approving the form of the Purchase Contract, and scheduling the auction for September 16, 2008. *See* Order Granting Mot. to Establish Procedures, ECF No. 49. The Debtor subsequently obtained court authority to retain the auction company, GoIndustry Dovebid, to conduct the auction. In advertising for the auction, GoIndustry sent out a flyer identifying the property being sold as a "Modern Convenience Store, Gas Station and Car Wash on 2.20 +/- Acres". The flyer further provided:

> The property is being sold in an "AS IS" condition with no warranties, guarantees or representations of any kind. Information in this brochure has been obtained from sources believed to be accurate but is not guaranteed. Your complete inspection of the property and substantiating documents is advised.

GoIndustry also advertised the auction sale on its website, which included, among other things, a "Property Information Package." The executive summary of the Property Information Package specifically identified the property being sold as a "4800+/- sq. ft. convenience store, five pump islands with 3836+/- sq. ft. fuel island canopy and 800+/- sq. ft. car wash." The Property Information Package also contained a disclaimer, titled "NOTICE TO ALL BIDDERS," which stated, *inter alia*, that the property was being auctioned in an "AS IS," "WHERE IS" condition and that neither GoIndustry nor the Seller or their respective agents make any express or implied warranties of any kind. GoIndustry also provided on its website an appraisal of the property at $4.65 million; this same appraisal was announced at the beginning of the auction.

Hage first learned about the auction sale from his friend, Bill Maxakoulis. Upon learning of the sale and deciding to bid, however, Hage neither visited the GoIndustry website nor reviewed any other documentation pertaining to the sale or the gas station prior to actually placing his bid the day of the auction. Hage also did not request from Maxakoulis, and Maxakoulis did not provide to Hage,

any information or documentation concerning the gas station.

As scheduled, the auction sale of the gas station was conducted at the station site on the morning of September 16, 2008. Upon registering, which included depositing a $100,000 check making them eligible to bid, each of the eight or nine bidders was provided with a copy of the Property Information Package. Following a few preliminary comments, the auctioneer announced: "Now folks, we are selling real estate here today. The building and the land. We are not selling inventory, we are not selling stocks, we are not selling gas. You are not buying those three items; you are not buying inventory, stock, and gas. . . . Some of the fixtures may be leased. You are buying the fixtures in the building, the counters and the racks if they're owned by the gas station." The auctioneer then read the Notice to all Bidders from the Property Information Package in its entirety. Although Hage admitted receiving the Property Information Package upon registering at the auction, he emphatically claimed that he did not read, or even skim, the documents prior to commencement of the bidding. Rather, according to Hage, he bid based solely upon the announcements made by the auctioneer at the commencement of the auction.

During the bidding process, Pradhan and Hage, perhaps caught up in the frenzy of the auction process, chose to bid against each other well after the other bidders had decided to stop bidding, at amounts well in excess of those each acknowledged he was originally prepared to bid. Regardless, at the end of the bidding process, PBI stood as the high bidder with a bid of $4.2 million, which, with a 10% buyer's premium, constituted an effective purchase offer of $4,620,000. Hage followed as the backup bidder with an effective purchase offer of $4,565,000. At the conclusion of the auction, both Pradhan and Hage executed a Bid Acknowledgment form as well as their respective purchase contracts, which were identical in all aspects except purchase price. The Purchase Contract provided,

*inter alia*, as follows:

> . . . SELLER agrees to sell and PURCHASER agrees to buy the property and the improvements thereon . . . and as more particularly described by an accurate survey and description, together with whatever personal property, furniture, fixtures and equipment so located and related to the operation of the business, (and specifically excluding any personal property, furniture, fixtures and equipment that may be the legal property of tenants) hereinafter referred to as PROPERTY . . . .

The Purchase Contract further provided:

> DAMAGES FOR PURCHASER'S BREACH. In the event of default by PURCHASER in the consummation of the purchase of PROPERTY in accordance with the terms of this CONTRACT, the deposit and interest accrued theron shall be forfeited to SELLER. In addition, SELLER reserves the right to pursue any and all legal remedies at law or equity including the right to maintain an action for specific performance or to have PROPERTY resold at the risk and expense of PURCHASER.

Testimony established that Hage clearly understood that, as the backup bidder, he would be obligated to close as purchaser in the event that the PBI Defendants defaulted.

Two days after the auction, Hage, Pradhan, and Bill Maxakoulis arranged a private meeting in Hage's office. Hage claims it was at this meeting that he first learned from Pradhan of the existence of Sunrise Chevron, the company which operated the gas station. In addition, Hage asserts that Pradhan told him that Sunrise Chevron owned everything at the gas station other than the four walls and that Sunrise Chevron had an Operating Agreement with the Debtor which allowed it to operate the gas station irrespective of any sale.[1] According to Hage, Pradhan revealed that he was considering defaulting because of these disclosures. Hage claims he was shocked to learn of these

---

[1] Pradhan testified at trial that, shortly after he executed his Purchase Contract, Bill Maxakoulis approached him and made these same disclosures to him.

disclosures as well, particularly the alleged Operating Agreement.

Indeed, the PBI Defendants voluntarily defaulted. Hage was then advised by the Debtor's counsel that he would be required to post the additional deposit money and close under his Purchase Contract. Hage responded through counsel, who claimed that the sale was misleading and improper and demanded the immediate refund of his client's $100,000 deposit. Ultimately, Hage did not post the additional deposit money and subsequently defaulted under his Purchase Contract.

As a result of the defaults by Pradhan and Hage, the Debtor moved to confirm the forfeiture of their $100,000 initial deposits which they had posted to qualify them to bid at the first auction. *See* Mot. to Confirm Forfeiture of Deposits, Sep. 30, 2008, ECF No. 63. The motion specifically referenced the above-cited provision in the Purchase Contract titled "DAMAGES FOR PURCHASER'S BREACH." The PBI Defendants neither filed a pleading in response to such motion nor appeared at the hearing on the motion. Accordingly, on November 12, 2008, the Bankruptcy Court granted the forfeiture motion as to PBI only and deemed the PBI Defendants' initial $100,000 deposit posted by the PBI Defendants as forfeited to the Debtor's estate. *See* Order Granting Mot. to Confirm Forfeiture of Deposits, ECF No. 123.

Shortly after her appointment as Trustee, Appellee Salkin sought and received authority from the Bankruptcy Court to sell the Debtor's property at a second auction. The second court-approved auction commenced on December 8, 2008, and Hunter Chambliss submitted a high bid of $3,050,000, for a total purchase price of $3,355,000, inclusive of the 10% buyer's premium. The sale closed, resulting in the Debtor's estate receiving $1,210,000 less than it would have received had Hage closed on his backup bid after the first auction. The Bankruptcy Court awarded this amount, less the $50,000 paid by Hunter Chambliss to Sunrise Chevron for equipment and furniture omitted

from the second auction, in actual damages to Salkin, for a total principal award of $1,160,000. Ultimately, the Bankruptcy Court concluded that "[Hage's] motivation in defaulting was the result of recognizing that he had bid too high. This is classic case of buyer's remorse. . . ."

## II. Discussion

This Court notes at the outset that it must affirm the Bankruptcy Court's findings of fact unless they are clearly erroneous. Conclusions of law, however, are reviewed de novo. *In re Holywell Corp.*, 913 F.2d 873, 879 (11th Cir. 1990). Hage raises three main arguments on appeal; the Court will address each in turn.

### A. Fraudulent Misrepresentation

Hage's first argument on appeal is that the first auction was fraudulently conducted and that, as a result, his Purchase Contract is unenforceable. Hage Br. at 15-27. Specifically, Hage argues that the Debtor and the auction company misrepresented what was being sold at the first auction, thereby misleading bidders into believing that the successful purchaser would receive a turnkey gas station operation. In support of this argument, Hage points to the auctioneer's use of the phrase "owner operator" in his announcement to prospective bidders just prior to commencement of the bidding, as well as to the auction company's advertising materials–including the $4.65 million appraisal–distributed to prospective bidders and announced at the beginning of the auction. *Id.* at 16. As further evidence that he was misled, Hage points to the Debtor's failure to disclose the purported Operating Agreement in favor of Sunrise Chevron. Hage Br. at 19-24.

The Bankruptcy Court considered these same arguments below, however, and found them to be without merit. Specifically, after reviewing the advertising materials and listening to a recording of the auction, the Bankruptcy Court "saw nothing in the Property Information Package

. . . or heard anything in the [auctioneer's] announcements . . . to justify finding that GoIndustry was warranting to prospective bidders that any and all personal property located at the [station] was included in the sale or that the successful purchaser could operate the business using that property." Findings of Fact and Conclusions of Law at 11. In addition, the Bankruptcy Court found that Hage was not prepared to perform under his Purchase Contract *regardless* of the existence of the purported Operating Agreement. *Id.* at 17. Finally, the Bankruptcy Court specifically found that:

> [W]hile Sunrise Chevron claimed ownership of everything at the station including the gas pumps, walk in refrigerators, etc., (i) it was agreed, ordered, and represented at the inception of the case that the operations of Maxko and Sunrise Chevron would be treated *as one*, (ii) the gas station pumps and canopies, walk in refrigerators and certain other fixtures at the station were property of the Debtor *irrespective* of anything Bill Maxakoulis had to say . . . and (iii) the purported operating agreement, which Maxakoulis never produced until well after the auction and whose authenticity was *dubious at best* could have been rejected, as it subsequently was, in the bankruptcy.

*Id.* at 22 (emphasis added). Accordingly, the Bankruptcy Court determined that Hage was not misled as to what he was bidding on, *id.* at 11, and concluded as a matter of law that Hage was not the victim of any fraudulent misrepresentations by the Debtor or the auction company. *Id.* at 26. Upon careful review, this Court finds no error in that conclusion or in the extensive factual findings supporting it.

### B. Mistake

Hage's second argument on appeal that he is entitled to rescission of his Purchase Contract based upon theories of unilateral or mutual mistake. Hage Br. at 26-27. At the outset, this Court notes that, "[r]escission and cancellation are harsh remedies . . . not favoured by the courts." *Rood Co. v. Bd. of Pub. Instruction of Dade Cnty.*, 102 So. 2d 139, 142 (Fla. 1958). Regardless, the

Bankruptcy Court rejected this same argument by Hage below, finding that Hage had failed to demonstrate the existence of a real mistake of material fact or that any such mistake was not the result of his own lack of due care. *See* Findings of Fact and Conclusions of Law at 28-29. This Court agrees, resting on the Bankruptcy Court's well-reasoned opinion. Accordingly, the Court finds that the Bankruptcy Court did not err in finding that Hage's claim of mutual or unilateral mistake was unsupported by the evidence.

## C. Damages

Lastly, Hage argues on appeal that the Trustee has failed to present evidence of actual damages, and that, in the alternative, any damages should be limited to the amount of Hage's $100,000 forfeited deposit.[2] Hage Br. at 27-29. The Bankruptcy Court rejected these same arguments below in finding that the Trustee was entitled to the recovery of actual damages. *See* Findings of Fact and Conclusions of Law at 34-41. Ultimately, the Bankruptcy Court found the appropriate measure of damages to be the difference between the sale price under Hage's Purchase Contract and the resale price, less the $50,000 paid by Hunter Chambliss, the subsequent purchaser, to Sunrise Chevron for equipment and furniture omitted from the second auction. *Id.* at 41. In reaching this determination, the Bankruptcy Court specifically rejected Hage's argument–reasserted now on appeal–that the res of what was being sold at the first and second auctions substantially differed, thereby making it impossible to quantify damages based on the difference in the two sales prices. *Id.* at 39-40. This Court finds no error in the measure of damages awarded by the Bankruptcy

---

[2] With regard to Hage's argument that the Trustee's damages, if any, should be limited to the amount of the forfeited deposit, the Court notes that it has already rejected, after extensive analysis, a virtually identical claim by PBI and Pradhan in their appeal against the Trustee. *See Palm Beach Int'l, Inc. v. Salkin*, No. 10-60995-CIV, 2010 WL 5418995, at *6-8 (S.D. Fla. Dec. 23, 2010). Accordingly, the Court need not discuss this argument any further here.

Court. Such a measure is consistent with both the case law, *see In re Winston Inn & Restaurant Corp.*, 120 B.R. 631, (Bankr. E.D.N.Y. 1990) ("As a general rule, 'a delinquent purchaser may be ordered to pay the deficiency resulting from a resale.'") (internal citation omitted), and with the plain language of the Purchase Contract, which provided that, "[in] the event of default by purchaser . . . seller reserves the right . . . to have property resold at the risk and expense of purchaser."

### III. Conclusion

Having closely reviewed the Bankruptcy Court's Findings of Fact and Conclusions of Law, and having considered the briefs and oral argument of counsel for the parties, the pertinent portions of the record on appeal, and the applicable law, this Court finds that the Bankruptcy Court's entry of final judgment in favor of Appellee Sonya Salkin and against Appellant Henri Hage was proper and correct as a matter of law and was based on sufficient factual findings which were not, themselves, clearly erroneous. Accordingly, it is

**ADJUDGED** that the Bankruptcy Court's Second Amended Final Judgment **(D.E. No. 93)**, entered on **April 6, 2010** in the Hage adversary case, is AFFIRMED in its entirety.

DONE AND ORDERED in Chambers at Miami, Florida, this 25 day of January, 2011.

_____
FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies provided to:

Counsel of Record